WO

**NOT INTENDED FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Charles Adams, et al., | ) | No. CIV 10-1088-PHX-DKD |
| Plaintiffs, | ) | |
| vs. | ) | **ORDER** |
| US Airways, Inc., et al., | ) | |
| Defendants. | ) | |

This Order addresses the pending motions for summary judgment. Defendant US Airways moves for summary judgment based upon its contention that it was not a joint employer of the skycaps at Phoenix Sky Harbor International Airport. Plaintiffs oppose the motion contending that the very broad definition of employer under the Fair Labor Standards Act ("FLSA") carries US Airways within the sweep of this definition. As discussed in the Court's February 11, 2011 Order [Doc. 29] and at length during oral argument, the Ninth Circuit addressed the joint employer issue in a case involving the airline industry in *Moreau v. Air France*, 356 F.3d 942 (9th Cir 2004). Although factually distinct, that decision describes the analysis employed to determine whether an employer is a joint employer for FLSA purposes. The *Moreau* court considered a non-exhaustive list of five factors drawn from the regulations promulgated pursuant to the Migrant and Seasonal Agricultural Worker Protection Act:

1. The nature and degree of control of the workers;
2. The degree of supervision, direct or indirect, of the work;
3. The power to determine the pay rates or methods of payment of the workers;

    4.    The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and

    5.    Preparation of payroll and the payment of wages.

29 C.F.R. § 500.20(h)(4)(ii). The Ninth Circuit also considered "non-regulatory" factors that may be relevant to joint employment status:

    1.    Whether the work was a speciality job on the production line;

    2.    Whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

    3.    Whether the premises and equipment of the employer are used for the work;

    4.    Whether employees had a business organization that could or did shift as a unit from one worksite to another;

    5.    Whether work was piecework or not work that required initiative, judgment or foresight;

    6.    Whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

    7.    Whether there was permanence in the working relationship; and

    8.    Whether the service rendered is an integral part of the alleged employer's business.

*Moreau* at pp. 947-48.

Fundamentally, however, whether a particular relationship should be deemed joint employment is determined by an "economic reality" test. Where the employee is, as a matter of economic reality, dependent upon an employer, an employer-employee relationship may be found. A consideration of the regulatory and non-regulatory factors may enable a court to identify those joint employers properly captured within the sweep of the FLSA and those employers who have entered into a business partnership with the employee that is more consistent with an outsourcing relationship that is not necessarily within the scope of the Act. *Jean-Louis v. Metro. Cable Communications, Inc.,* 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011).

A court is to consider the economic realities to determine whether the employment relationship with the putative joint employer is a subterfuge for the purpose of evading the protections of the FLSA. *See Zheng v. Liberty Apparel Co., Inc*, 355 F.3d 61 (2nd Cir. 2003).

In 2005, US Airways contracted with Prospect Airport Services, Inc., to provide skycap services to US Airways passengers for curb side check in at Sky Harbor. Prospect in turn contracted with Independent Skycap Services, LLC. ("ISS"). Plaintiff's Statement of Facts A.1-2. [Doc. 98-1]. In June 2008, it is undisputed that US Airways informed Prospect that it was terminating the contract for skycap services. ISS then terminated its skycaps who worked for US Airways passengers. Thereafter, US Airways placed some of its own employees on the curb to handle bags.

US Airways contends that "[l]ike the airline in *Moreau*, US Airways did not hire or fire its subcontracted workers, meaningfully supervise their work, pay them or decide how they would be paid, or maintain their employment records." Reply at p.1. Plaintiffs on the other hand contend that it is "readily apparent" US Airways had "'complete economic control'" over its relationship with the skycaps. Plaintiffs' Opposition at pp. 5-6 *quoting Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir. 1983) [Doc. 98]. The Court does not find it so "readily apparent."

First, with respect to the factor of whether US Airways had the "[r]ight, directly or indirectly, to hire, fire, or modify the employment conditions of the workers" *Moreau* at p. 947, Plaintiffs contend that US Airways "was involved in the hiring of Plaintiffs." Opposition at p. 6. Plaintiffs cite Disputed Facts 5-8 which relay the following:

> Ron Rhoderick, US Airways' Director of Passenger Services asked Plaintiff Craig to work for US Airways: "The station manager asked me would I leave Complete Skycap Service to go to Independent and work over there." Craig Deposition at p. 30 [98-3]. Craig thereafter testified that no one from ISS recruited him or spoke with him about working there. *Id.* at p. 32. He filled out an application and was hired. *Id.* at p. 36.

- 3 -

1  Similarly, skycap Alfred Gordon testified that US Airways' involvement
2  in his hiring by ISS was "Ron [Rhoderick] had told them I was okay." Gordon
3  Deposition at p. 93 [Doc 98-3].

4  Charles Adams was asked at his deposition whether "As far as you know,
5  did US Airways have any input into the decision to hire you as a skycap at ISS?"
6  He responded, and Plaintiffs' cite in opposition to the Motion: "So far – they had
7  the input to hire whoever they wanted out there. If they don't want certain people
8  out there, they don't have to have them on the curb." After an objection and
9  motion to strike were placed on the record, Mr. Adams was asked, "So for you
10  being hired initially at ISS in 2003 or 2004, do you know whether US Airways
11  had any input into that decision?" Plaintiff Adams answered, "Not that I know
12  of."

13 This is the sum of evidence Plaintiffs advanced in support of the alleged right of US Airways
14 to hire skycaps who worked for ISS. The testimony of each of these Plaintiffs falls short of
15 what Plaintiffs claim. Craig did not testify that US Airways had the power to bring about his
16 employment at ISS. The testimony reveals nothing other than the fact that Craig applied for a
17 job and was hired. That a US Airways supervisor asked Craig if he would leave his current
18 employer and switch to the US Airways curb, even if one concludes that *Craig* thought this was
19 an offer of employment, does not demonstrate that US Airways had the right, directly or
20 indirectly, to hire Craig. It is just as likely that ISS saw it in its best interest to hire someone
21 like Craig with prior experience with the US Airways system that he had used at Terminal 2.
22 *See* Craig Deposition at p. 30.

23 The Gordon testimony is similarly infirm on this point. His testimony is not evidence
24 of anything other than a favorable recommendation about an employee who had experience
25 using the computer system that US Airways would be using at Terminal Four. It cannot be
26 fairly described as evidence that US Airways had the right to hire Mr. Gordon. Plaintiffs'
27 Opposition cites Gordon's testimony that he believed US Airways was his employer and that

- 4 -

1  US Airways would supervise him. But he testified on the same page that he did not think that
2  US Airways was going to pay him, that ISS would pay him, that "both" ISS and US Airways
3  would supervise him, and that he agreed with the statement "that you were going to be working
4  for ISS and the job you would do would be on the US Airways' curb." Gordon Deposition. at
5  p. 60.

Taken together, Plaintiffs' evidence is at best that two employees were encouraged to apply to be skycaps on the US Airways' curb. This is not probative of the relevant issue. Indeed, it demonstrates that Rhoderick did not have hiring authority because no witness testified that Rhoderick hired him. Rhoderick directed these witnesses to contact the person at ISS with hiring authority.

With regard to the right to fire, it is undisputed that the contract between US Airways and Prospect provided as follows:

> ARTICLE 5. CONTRACTOR'S EMPLOYEES
>
> 5.1 Contractor's Employees. The employees of Contractor engaged in performing Services hereunder will be considered employees of Contractor for all purposes and will under no circumstances be deemed to be employees of US Airways. US Airways will have no supervisory power or control over any such Contractor's employees and any complaint or change in procedure will be transmitted by US Airways to Contractor who will in turn promptly give any necessary instructions to its own personnel.
> 5.2 Supervision of Employees. Contractor is responsible for the direct supervision of its employees through its designated representative and such representative will in turn, report to and confer with the designated agents of US Airways with respect to the Services.
> 5.4 Removal of Contractor's Employees. At US Airways' request, Contractor will immediately remove from service under this Agreement any employee whose acts or omissions, in US Airways' opinion, where such opinion will not be such that its basis would be a violation of applicable law in the case of dismissal of an employee, constitute a breach of this Agreement.

[Doc. 98-4, p. 49]

Plaintiffs contend that ¶ 5.4 confers on US Airways an actual right to fire because the ISS skycaps handled no other carrier's bags. However, the record does not demonstrate that this power was ever exercised. The record does contain evidence of US Airways indicating consequences for ISS employees who did not provide services consistent with the contract, but that evidence affirms that it is not US Airways' decision and also suggests that employees would

- 5 -

1 be removed from passenger contact but could continue employment in other capacities. On the
2 ability to fire, Plaintiffs point to an email from US Airways to Prospect which complains about
3 a skycap having suggested that he receive a tip and threatens that "US Airways will request the
4 individual not be allowed to provide services to our customers anymore." Exhibit F, page 2 [98-
5 5]. Again, this is not evidence of an ability to fire an ISS employee. US Airways' articulation
6 of such a concern is consistent with a contractor taking steps to assure that it is receiving the
7 bargained for service. As in *Moreau*, "Air France was, however, very specific about how it
8 wanted its work performed, and it checked to ensure that its standards were met and that the
9 service provider's overall performance adhered to Air France's specifications." *Moreau* at p.
10 951.

11 Plaintiffs also contend that US Airways supervised and controlled the skycaps' work
12 schedules and conditions of employment because the contract between Prospect and US
13 Airways required "the skycap service provider to 'provide the appropriate number of uniformed
14 personnel to perform such service as requested by US Airways' local management in writing.'"
15 Response at p. 9. But is this the same thing as setting or controlling the employees work
16 schedules? *Moreau* answers the question in the negative and this analysis is appropriate here.
17 US Airways did, like Air France in *Moreau*, schedule its flights and this in turn determined the
18 number of employees which would be necessary to provide the contracted services. But US
19 Airways, again like Air France, never had any responsibility "for designating which employees
20 would report to service" the scheduled flights. *Moreau* at p. 950, n. 5.

21 Plaintiffs assert that US Airways controlled the conditions of employment by its direct
22 involvement in the supervision and disciplining of skycap employees. In support, Plaintiffs cite
23 the testimony of employees regarding the specific instructions issued by US Airways to
24 individual skycaps, but a review of the testimony reveals that US Airways did not usually issue
25 these instructions directly to the skycaps but to the ISS and Prospect managers. In those
26 meetings where witnesses testified that US Airways personnel directly communicated with the
27 skycaps, such interaction does not evidence control but rather the appropriate supervision of an

28

outsourcing contractor. Arguing against these alleged indicia of control are the undisputed facts that ISS was responsible for setting the skycaps' work hours, granting medical or other leave, and maintaining all pay records.

Plaintiffs also suggest that further evidence of US Airways supervision and control of the skycaps is the fact that US Airways directed where the bags should be placed. The placement of the bags to facilitate their loading on the US Airways planes is a natural linkage between two employers where US Airways wishes to have the bags placed in a way that will facilitate the loading of the bags on its planes. Moreover, given the security requirements that are imposed on air carriers to assure that bags are linked to passengers who board the US Airways planes, it is ineluctable that US Airways would impose requirements on the handling of the bags that would come into its custody. *Moreau* at p. 901.

Plaintiffs contend that US Airways maintained employment records because it kept records of the number of bags that were checked in. This record-keeping, however, was necessary because US Airways paid its subcontractor based upon the number of bags that were checked. There is no evidence in the record that US Airways maintained any other type of employment record that would typically be maintained by an employer. US Airways did not set the rate or method of the skycaps' payment. The fact that US Airways' occasionally awarded travel certificates to skycaps is of no evidentiary weight on this record because of the rarity of these events.

With respect to the non-regulatory factors, as the Ninth Circuit observed in *Moreau*, many of the factors drawn from the farm-field workplace at issue in *Torres-Lopez v. May,* 111 F.3d 633 (9th Cir. 1997), do not translate to the employment context of airport curbside check in. The most compelling non-regulatory factor in favor of joint employer status is the fact that the Plaintiff skycaps worked only at the US Airways curb. Yet the impact of this factor is reduced by the fact that the skycaps worked for another carrier before they worked the US Airways curb. Also, there is no suggestion in the record that the ISS skycaps could not have

- 7 -

worked for another carrier at any time. *Jean-Louis v. Metropolitan Cable Communications, Inc.*, 838 F.Supp.2d 111, 133 (S.D.N.Y. 2011).

As informed by *Moreau*, this Court is to "consider the totality of circumstances and all relevant factors." *Moreau* at p. 952. While it is true that US Airways "provided almost all of the equipment utilized by skycaps" there is very little equipment necessary to the performance of skycap services. The skycaps utilized a desk provided by US Airways as well as baggage tags and computer terminals and printers to print out the baggage tags. These limited number of "tools" were necessarily provided by US Airways. In addition, it is undisputed that the property on which the work was performed was the airport owned by the City of Phoenix.

Plaintiffs maintain that the skycaps work was a "speciality job on the production line . . . [constituting] part of the integrated unit of production." This factor is not compelling or even particularly relevant here because the skycaps' function was not integral to the activity of the alleged joint employer. US Airways ultimately terminated its contract with the skycaps' employer, discarded the model that provided for the use of skycaps and continued its business as a passenger airline. Moreover, even when the skycap service was available at the US Airways curb many passengers chose to fly US Airways without making use of the service the skycaps provided. It is this fact that dominates the Court's analysis of the non-regulatory factors. The skycaps services were ancillary and indeed even incidental to US Airways' operations. In stark contrast, the cucumbers in the fields of *Torres-Lopez* could not be sold if they were not picked by the workers. Even in cases where courts have found no joint employer status, the services provided by the alleged joint employees were far more integral. In *Jean-Louis v. Metropolitan Cable,* no cable service would be viewed if the cable boxes were not installed by the alleged joint employers and it seems beyond contemplation to imagine an intercontinental Air France flight without food service. Yet in both *Jean-Louis v. Metropolitan Cable* and *Moreau,* the courts found no joint employer status. Here, where the skycaps provided a convenience service that was not and is not used by many passengers, US Airways' conduct is more consistent with a permissible outsourcing contract than a subterfuge around the

1  wage and hour laws. The record evidence of the factors the Court is to consider is not to the
2  contrary. Accordingly, the Court will grant US Airways Motion for Summary Judgment on the
3  federal claim as well as the state law claims which track the federal analysis. The Court,
4  however, will deny Prospect's Motion for Summary Judgement without prejudice and grant
5  Plaintiffs' Motion for Rule 56(d) relief given that Plaintiff's did not have a fair opportunity to
6  pursue joint employer discovery against Prospect. The remaining parties in the case shall confer
7  and submit to the Court within 21 days a joint report with their proposal(s) regarding discovery
8  and case management deadlines for the balance of the case.

   IT IS ORDERED GRANTING US Airways' Motion for Summary Judgment [Doc 86] and DENYING WITHOUT PREJUDICE Prospect's Motion for Summary Judgment.[Doc. 92].

   IT IS FURTHER ORDERED that the remaining parties in the case shall confer and submit to the Court within 21 days a joint report with their proposal(s) regarding discovery and case management deadlines for the balance of the case.

   DATED this 29th day of March, 2013.

_____
David K. Duncan
United States Magistrate Judge